GARG GOLDEN LAW FIRM
ANTHONY B. GOLDEN, ESQ.
Nevada Bar No. 9563
PUNEET K. GARG, ESQ.
Nevada Bar No. 9811
3145 St. Rose Parkway, Suite 230
Henderson, Nevada 89052
Tel:  (702) 850-0202
Fax:  (702) 850-0204
Email: agolden@garggolden.com

Counsel for Defendants Ryan Roach,
New Choice Communications, Inc., and
Lighthouse Communications, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, United States Department of Labor,<br><br>                                        Plaintiff,<br><br>v.<br><br>WELLFLEET COMMUNICATIONS, LLC, a Nevada Limited Liability Company; NEW CHOICE COMMUNICATIONS, INC., a Nevada Corporation; LIGHTHOUSE COMMUNICATIONS, LLC, a Nevada Limited Liability Company; ALLEN ROACH, an individual; RYAN ROACH, aka RYAN LORE, an individual,<br><br>                                        Defendants. | CASE NO.:     2:16-cv-02353-GMN-GWF<br><br>**DEFENDANTS NEW CHOICE COMMUNICATIONS, INC., LIGHTHOUSE COMMUNICATIONS, LLC, AND RYAN ROACH'S MOTION FOR SUMMARY JUDGMENT** |

Defendants New Choice Communications, Inc., ("New Choice"), Lighthouse Communications, LLC ("Lighthouse"), and Ryan Roach (collectively, "Defendants"), by and through their counsel of record, the Garg Golden Law Firm, hereby move for summary judgement pursuant to Federal Rule of Civil Procedure 56. There is no genuine dispute as to any material fact, and Defendants are entitled to judgment as a matter of law.

/ / /

/ / /

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

1 of 8

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE

1. New Choice and Lighthouse are telemarketing companies. Ex. A at 20:23 – 21:17.

2. Ryan Roach is an owner of New Choice and Lighthouse. *Id.*

3. New Choice purchased the assets of Defendant Wellfleet Communications, LLC on April 29, 2016. Ex. B.

4. Wellfleet had undergone an investigation by the U.S. Department of Labor ("DOL") regarding direct sellers being classified as independent contractors, but the DOL verified that Wellfleet had "come into compliance effective 02/01/2016 by tracking all hours worked and paying at least minimum wage for all hours worked to all employees." Ex. C at DOL036131.

5. Plaintiff added Defendants to this case upon the filing of the First Amended Complaint ("FAC") (ECF No. 44) on September 18, 2017.

### STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A "genuine issue" does not exist "where the only evidence presented is uncorroborated and self-serving testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal citations omitted).

Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules. *Celotex Corporation v. Catrett*, 477 U.S. 317, 327 (1986). One of the purposes of such a motion is to dispose of unsupported claims. *Id.* at 323-24. Therefore, "after adequate time for discovery" the entry of summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

2 of 8

party's case and on which that party will bear the burden of proof at trial." *Id*. at 322.

**ARGUMENT**

**I.      THE FLSA'S STATUTE OF LIMITATIONS BARS MUCH OF PLAINTIFF'S CLAIMS.**

Defendants join and incorporate herein the arguments raised in the Motion for Summary Judgment filed by Defendants Wellfleet and Allen Roach regarding the statute of limitations (ECF No. 148 at 13-19). Defendants provide the following additional argument for the Court's consideration.

Through legislation codified in 1938 and 1966, Congress adopted a two-tiered statute of limitations for FLSA violations. Actions for unpaid minimum wages, unpaid overtime, or liquidated damages under the FLSA "may be commenced *within two years* after the cause of action accrued, and every such action *shall be forever barred* unless commenced within *two years* after the cause action accrued, except that a cause of action arising out of a *willful violation may be commenced within three years* after the cause of action accrued." 29 U.S.C. § 255(a) (emphasis added).

The FLSA's standard two-year statute of limitations can be extended to three years *only* if the plaintiff sufficiently proves a "willful" violation. *See id*. Efforts to exceed the standard two-year statute of limitations can be established if, and only if, the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . ." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Even an employer that acts unreasonably, but not recklessly, cannot be held to have acted willfully under the FLSA. *See McLaughlin*, 486 U.S. at 135, n.13; *see also Mireles v. Frio Foods, Inc.*, 899 F.2d, 1407, 1416 (5th Cir. 1990) (failure to seek legal advice concerning pay practices does not, taken alone, demonstrate a willful violation); *Zannikos v. Oil Inspections (USA), Inc.*, 605 Fed. Appx. 349, 360 (5th Cir. 2015) (employer that knew of FLSA's potential applicability but failed to research or consult with an attorney or DOL did not willfully violate the FLSA); *Regan v. City of Charleston*, 142 F. Supp. 3d 442, 436 (D.S.C. 2015) (defendant did not act willfully where its incorrect assumption resulted in the erroneous calculation of overtime); *Lugo v. Farmer's Pride, Inc.*, 802 F. Supp. 2d 598, 617-18 (E.D. PA.

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

2011).

Plaintiff did not add Defendants to this case until September 18, 2017. Therefore, any claims that predate September 18, 2015 are time-barred as a matter of law, and judgment should be entered in Defendants' favor on those claims. Nevertheless, Plaintiff is attempting to recover on claims that date back to October 15, 2012—nearly three years beyond the statute of limitations cutoff in this case. *See* FAC (ECF No. 44) at ¶¶ 32, 33, and 34.

## A. ALL CLAMS AGAINST DEFENDANTS BEFORE SEPTEMBER 18, 2015 ARE TIME-BARRED.

Plaintiff did not add Defendants to this case until September 18, 2017. Therefore, any claims that predate September 18, 2015 are time-barred as a matter of law, and judgment should be entered in Defendants' favor on those claims. Nevertheless, Plaintiff is attempting to recover on claims that date back to October 15, 2012—nearly three years beyond the statute of limitations cutoff in this case. *See* FAC (ECF No. 44) at ¶¶ 32, 33, and 34. As will be discussed more fully, "willfulness," the relation back doctrine, and equitable tolling do not extend the limitations period on Plaintiff's claims.

## B. PLAINTIFF LACKS EVIDENCE SUFFICIENT TO GO TO A JURY THAT DEFENDANTS' CONDUCT WAS WILLFUL.

To extend the statute of limitations from two to three years under the FLSA, Plaintiff must show Defendants' conduct was willful. That is, Defendants "knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the FLSA." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (brackets and citations omitted). Negligent conduct is not enough for willfulness. *McLaughlin*, 486 U.S. at 133. Moreover, a court "will not presume that conduct was willful in the absence of evidence." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003).

In addition to the arguments raised by Defendants Wellfleet and Allen Roach in their Motion (ECF No. 148) regarding willfulness, Plaintiff has produced little to no evidence to suggest the conduct of Defendants here was willful. First, there is no evidence that New Choice or Lighthouse were involved in any decisions to treat the direct sellers as independent contractors.

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

4 of 8

Second, Plaintiff also provides no evidence that Ryan Roach had any input or influence in how the call center workers were classified or any authority over how they were classified. In fact, Ryan Roach had not even looked at the independent contractor agreements that were being signed by the call center workers when they were treated as independent contractors at Advanced Integrated Communications (a predecessor to Wellfleet) or at Wellfleet. *See* Ex. A at 125:7 – 127:7. He thought an independent contractor relationship was common business practice among call centers, and he never had any reason to believe call center workers would be misclassified if treated as independent contractors. *See id.* at 127:19 – 129:4. Even if Ryan Roach's actions were considered unreasonable, they do not amount to willfulness. *See McLaughlin*, 486 U.S. at 135, n.13.

Based on the foregoing, all of Plaintiff's claims that predate September 18, 2015 are time-barred as a matter of law, and judgment should be entered in Defendants' favor on those claims.

## II. NEW CHOICE DOES NOT HAVE SUCCESSORSHIP LIABILITY FOR ACTIONS DONE BY WELLFLEET.

The Ninth Circuit recognizes successorship liability under the FLSA. *See Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995). Successorship liability may attach when "1) the subsequent employer was a bona fide successor," and "2) the subsequent employer had notice of the potential liability." *Id.* at 846. Whether a subsequent employer is a bona fide successor hinges on the degree of business continuity between the successor and the predecessor. *See id.* Nevertheless, successorship liability's roots lie in the principles of equity and fairness. *See id.*

Here, successorship liability should not attach to New Choice. New Choice purchased the assets of Wellfleet on April 29, 2016. Ex. B. At that time, all of Wellfleet's direct sellers had been converted from independent contractors to employees. Ex. A at 155:24 – 156:2; Ex. C at DOL036131. Additionally, New Choice did not hire all of the direct sellers or even all of the managers from Wellfleet. Only some of the employees were hired by New Choice. *Id.* at 155:21 – 156:12. Given that by the time of the asset purchase by New Choice, the DOL had found Wellfleet to be in compliance with the FLSA, New Choice would have had no reason to believe or notice of it inheriting possible liability by way of the asset purchase. Accordingly, New Choice should not

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

5 of 8

be liable under the FLSA for violations committed by Wellfleet, which Defendants deny were committed in any event.

## III.   THE DIRECT SELLERS WERE PROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS.

To the extent the Court finds that Defendants could be liable for any time-period in which the direct sellers were classified as independent contractors, Defendants maintain that the direct sellers were properly classified as independent contractors and, therefore, Defendants are not liable under the FLSA as a matter of law. For argument on this issue, Defendants join and incorporate herein by reference the arguments by Defendants Wellfleet and Allen Roach on pages 27 through 30 of their Motion for Summary Judgment (ECF No. 148).

## IV.   LIQUIDATED DAMAGES SHOULD NOT BE APPLIED TO DEFENDANTS.

In the event there is a finding of liability against Defendants, liquidated damages should not be applied to Defendants. To that end, Defendants join and incorporate herein by reference the arguments on liquidated damages set forth on pages 19 through 27 of Defendants Wellfleet and Allen Roach's Motion for Summary Judgment (ECF No. 148).

## V.   CONCLUSION

Based on the foregoing, Defendants are entitled to a judgment as a matter of law on the issues set forth above.

Dated this 29th day of June, 2018.

GARG GOLDEN LAW FIRM

By /s/ Anthony B. Golden
ANTHONY B. GOLDEN, ESQ.
Nevada Bar No. 9563
3145 St. Rose Parkway, Suite 230
Henderson, Nevada 89052
(702) 850-0202
*Counsel for Defendants Ryan Roach, New Choice Communications, Inc., and Lighthouse Communications, LLC*

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

6 of 8

1

## **CERTIFICATE OF SERVICE**

2      I certify that on the 29th day of June, 2018, I electronically filed the foregoing

3   DEFENDANTS   NEW   CHOICE   COMMUNICATTIONS,   INC.,   LIGHTHOUSE

4   COMMUNICATIONS,  LLC,  AND  RYAN  ROACH'S  MOTION  FOR  SUMMARY

5   JUDGMENT with the Clerk of the Court by using the ECF system, which served the following

6   parties electronically:

7                    Susan Seletsky, Esq.
                    Laura C. Bremer, Esq.
8                    Tara Stearns, Esq.
                    David Edeli, Esq.
9                    U.S. Department of Labor
                    Office of the Solicitor
10                    *Counsel for Plaintiff*

11                    Malani L. Kotchka, Esq.
                    Hejmanowski & McCrea LLC
12                    *Counsel for Defendants Wellfleet Communications LLC and*
                    *Allen Roach*

13

14                    By  */s/ Anthony B. Golden*
                        For the GARG GOLDEN LAW FIRM

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

1

**INDEX OF EXHIBITS**

2    Ex. A                                    Select pages from Deposition of Ryan Roach

3    Ex. B                                    Purchase of Business Agreement

4    Ex. C                                    Fair Labor Standards Act Narrative Report

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GARG GOLDEN
LAW FIRM
3145 St. Rose Parkway
Suite 230
Henderson, Nevada 89052
(702) 850-0202

# EXHIBIT A

**(Select pages from Deposition of Ryan Roach)**

# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4   R. ALEXANDER ACOSTA,          )
     Secretary of Labor, United    )
 5   States Department of Labor,   )
                                   )
 6              Plaintiff,         )
                                   ) Case No.
 7         vs.                     ) 2:16-CV-02353-GMN-GWF
                                   )
 8   WELLFLEET COMMUNICATIONS,     )
     LLC, et al.,                  )
 9                                 )
                Defendants.        )
10   _____)

11

12

13

14            DEPOSITION OF RYAN ROACH

15             Friday, April 20, 2018

16                  9:34 a.m.

17         400 South Seventh Street, Suite 400

18              Las Vegas, Nevada  89101

19

20

21

22

23
     Reported By:
24   Gale Salerno, RMR
     CCR No. 542
25   Job No. 180420ORS

                                                      1
```

1    that?

2         A.   I did.

3         Q.   And did you spend some time helping to deal

4    with Advanced Integrated Communications?

5         A.   Yes.

6         Q.   When was that?

7         A.   Right after he passed away in, you know,

8    September of 2009.

9         Q.   How long did you stay out there?

10        A.   I don't remember exactly.  But, you know,

11   maybe a couple of weeks.  At first two weeks.

12        Q.   So John Martino spent a semester there,

13   didn't he?

14        A.   I don't remember.  I don't know.

15        Q.   Did you -- did you ever spend months at a

16   time at the call center?

17        A.   Not months, no.

18        Q.   Just a few weeks?

19        A.   Yes.  I had other commitments.

20        Q.   Right.  Because you were working for the

21   fire department in 2009?

22        A.   Correct.

23        Q.   And what is New Choice Communications,

24   Inc.?

25        A.   It's a telemarketing company.

                                                        20

1      Q.   And that was one of your father's companies
2  as well, correct?
3      A.   Yes.
4      Q.   Did you inherit New Choice?
5      A.   Yes.
6      Q.   Are you the sole owner?
7      A.   I think me and my brother are partners on
8  that one as well.
9      Q.   What about Lighthouse Communications?
10     A.   Yes.
11     Q.   What is Lighthouse Communications, LLC?
12     A.   A telemarketing communications center.
13     Q.   And was it one of your father's
14  companies?
15     A.   No.  I think I started that one.
16     Q.   You started it?
17     A.   Opened it, yes.
18     Q.   When was that?
19     A.   I don't remember.  I don't know the exact
20  year.
21     Q.   And why did you start Lighthouse?
22     A.   To sell AT&T.
23     Q.   AT&T what?
24     A.   Phone services.
25     Q.   So why did you start -- why did you need to

                                                          21

```
 1              Do you recognize this document?

 2      A.    I don't, no.

 3      Q.    Have you ever seen a document like this

 4  before?

 5      A.    No.

 6      Q.    Turn to page 76.

 7              And let me back up and say that the title

 8  of this is Independent Contractor Agreement for

 9  Direct Seller.

10      A.    Yes.

11      Q.    And the first page says that it's between

12  Advanced Integrated Communications and independent

13  contractor.  I can't make out that, Reginald

14  something.

15      A.    The name is on the front.  Legaspi.

16      Q.    On June 2nd, 2010.

17      A.    Yes.

18      Q.    So on the last page it says Advanced

19  Integrated, and then your name is underneath that,

20  and it's comma, president, slash Allen Roach GM?

21      A.    Yes.

22      Q.    So were you the president of Advanced

23  Integrated Communications at this time?

24      A.    I would have been.  Yes, I inherited that

25  company.
```

125

1      Q.    You inherited AIC?

2      A.    That was my father's company, yes.

3      Q.    But did you ever sign this agreement that's

4  blank where the signature is?

5      A.    I don't think so, no.

6      Q.    Were you in Las Vegas in June of 2010?

7      A.    I don't recall.  I don't know.

8      Q.    But you said you would go three to four

9  times a year?

10      A.    I would, yes.

11      Q.    Around that time?

12      A.    It could be, yes.

13      Q.    So did you ever have any discussions with

14  anyone -- any of the existing managers for AIC about

15  this agreement?

16      A.    No.

17      Q.    Did you ever talk to anyone else about this

18  agreement?

19      A.    No.

20      Q.    Were you aware that independent contractors

21  were signing it?

22      A.    No, I didn't -- I mean, I left it up to,

23  you know, I was kind of past practice, and if these

24  were in place, then that's what, you know, the sales

25  agents would sign.  I've never even really looked at

126

1   them.

2       Q.   Were you aware that contracts were being

3   signed by the sales agents?  Just I'm asking if

4   you're aware that there was an agreement, even if you

5   hadn't looked at them.

6       A.   Yes.  Yeah, I would assume that they would

7   sign something, yes.

8       Q.   So you were aware that they were -- the

9   sales representatives before 2016 were being treated

10  as independent contractors?

11      A.   Yes.

12      Q.   And that was through Lighthouse's sales

13  reps?

14      A.   Yes.

15      Q.   And Wellfleet.  Well, New Choice didn't

16  have its own payroll, right?  So do you know whether

17  New Choice had agreements with sales reps?

18      A.   I don't know.

19      Q.   Did you ever do any research about what

20  would be necessary to treat someone as an independent

21  contractor?

22      A.   No.

23      Q.   Did you ever ask anyone for advice about

24  that?

25      A.   No.  Past practice.  That's how -- I just

                                                    127

1   assumed that call centers were ran like that.

2      Q.   What made you assume that?

3      A.   Because that's how it was ran before.

4      Q.   That's how your father had run it?

5      A.   Yes.

6      Q.   How did you know that was the way he ran

7   it?

8      A.   I knew that they were all 1099.

9      Q.   Do you know whether your father had

10   consulted an attorney?

11      A.   I don't know.

12      Q.   Did you ever hear about sales reps filing

13   wage complaints with the State Labor Commissioner?

14      A.   No.

15      Q.   Did you -- were you aware of any complaints

16   at the time that your father passed away?

17      A.   No.

18      Q.   Did any sales reps ever talk to you about

19   being unhappy about their pay?

20      A.   No.

21      Q.   What about managers, did managers talk to

22   you about that?

23      A.   No.

24      Q.   When was the first time that you saw this

25   agreement or something like that?

128

1        A.    I don't know.

2        Q.    Today?

3        A.    Yeah, I never looked at one, to be honest.

4    I don't remember seeing them.

5              MS. STEARNS:   Now I'll pass out what was

6    previously marked Exhibit 4.

7                    (Exhibit 4 was marked for

8                     identification.)

9    BY MS. STEARNS:

10       Q.    Exhibit 4 is document 5-3, page 25 through

11   28.

12             Do you recognize Exhibit 4?

13       A.    No.

14       Q.    It appears to be an independent contractor

15   agreement for direct seller dated February 2014

16   between Wellfleet, and I can't read that handwriting,

17   an independent contractor slash direct seller.

18       A.    Yes.

19       Q.    But it seems to be slightly different than

20   the one that we looked at earlier.

21       A.    I'd have to look at them side by side.

22             It looks a little different.

23       Q.    Do you know who revised Exhibit 4 from the

24   original AIC one?

25       A.    No, I don't.

                                                    129

1      Q.   Was Allen the general manager of New Choice

2   at the time of this agreement?

3      A.   No.  He stayed on board for the -- you

4   know, to help out.

5      Q.   He stayed on board?

6      A.   For that year until 2017, yes.

7      Q.   He stayed on board managing the call center

8   business?

9      A.   Just overseeing, yes.

10      Q.   Why was that?

11      A.   Because I couldn't be here every day.  Just

12   the transition period.

13      Q.   And what happened in 2017?

14      A.   I don't know.  He left.

15      Q.   So who took his place?

16      A.   Really no one.  Managers run it day to day,

17   and they communicate with me, and that's pretty much

18   it.

19      Q.   They are still in Boston?

20      A.   Yes.

21      Q.   Did New Choice hire Wellfleet's employees

22   at the time of this agreement or shortly afterward?

23      A.   Some employees did, yes.

24      Q.   And at that point, all of the sales

25   representatives were already being treated as W-2

                                                      155

1    employees?

2        A.    Yes.

3        Q.    And the managers that had been employed by

4    Wellfleet, were they all hired by New Choice?

5        A.    Not all.

6        Q.    Not all of them?

7        A.    Just...

8        Q.    Just what?

9        A.    Just Stephanie and Midge.

10       Q.    So they were the only two managers that

11   stayed on?

12       A.    Yes.

13       Q.    Were any programs or campaigns eliminated

14   at this point?

15       A.    I don't think so, no.

16       Q.    So the campaign stayed the same?

17       A.    Yes.  It was Birch.

18       Q.    It was just Birch?  No other?

19       A.    I don't think any other campaigns, no.

20       Q.    So let me just see if I understand.  So the

21   LDP program had been eliminated in the prior fall or

22   earlier that year?

23       A.    The what program?

24       Q.    I'm sorry, long distance products.

25       A.    I think those were the only.  Oh...

                                                    156

# EXHIBIT B

## (Purchase of Business Agreement)

# EXHIBIT B


*Martino*
EXHIBIT NO. _95_
*3-16-18 MC*

# PURCHASE OF BUSINESS AGREEMENT

THIS PURCHASE OF BUSINESS AGREEMENT (the "Agreement") made and entered into this _29th_ day of April, 2016 (the "Execution Date"),

BETWEEN:

*Albert Rasch* of *WellFleet*, *Las Vegas* Nevada
(the "Seller")

OF THE FIRST PART

and

*Ryan Rasch* of *Boston*, *Mass*,
*John Martino* *New Choice Communication*
(the "Purchaser")

OF THE SECOND PART

## BACKGROUND

A.    The Seller is the owner of Wellfleet communication llc of 3100 W Sahara Ave 209, Las Vegas, Nevada 89102 (the "Business"), which carries on the business of Marketing under the operating name Wellfleet communication llc in the State of Nevada.

B.    The Seller owns the assets of the Business and desires to sell certain assets (the "Assets"), to the Purchaser, subject to any exclusions set out in this Agreement and the Purchaser desires to buy the Assets.

IN CONSIDERATION of the provisions contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the Parties agree as follows:

Page 1 of 14

WC001758

### Definitions

1. The following definitions apply in the Agreement:

   a. The "Assets" consists of the following:

      i. All equipment used in carrying on the Business.

      ii. All inventory and packaging.

      iii. All outstanding and confirmed sales orders.

      iv. All books, records and files, relevant to carrying on the Business.

      and does not include any Excluded Assets.

   b. "Closing" means the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration, and the transfer of title to the Assets.

   c. "Excluded Assets" means assets that are owned by the Seller but do not form any part of the Assets for the purpose of this transaction. Excluded Assets will include the following:

      i. Cash items held by the Seller including, but not limited to, cash bank balances, and term deposits.

   d. "Parties" means both the Seller and the Purchaser and "Party" means any one of them.

### Sale

2. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties, and conditions set out in this Agreement, the Seller agrees to sell the Assets to the Purchaser and the Purchaser agrees to purchase the Assets from the Seller.

### Purchase Price

3. The Parties agree that the Purchase Price for the Assets will be allocated among the Assets as follows subject to required adjustments that are agreed upon by the Parties:

| Business Equipment | $30,000.00 |
| --- | --- |

WC001759

Purchase of Business Agreement

| | |
|---|---|
| Inventory and packaging | $9,882.00 |
| Outstanding sales orders | $7,907.00 |
| Books, records and files | $2,211.00 |
| Sub-Total | $50,000.00 |
| State Sales Tax 0% (Reg. #:_____) | $0.00 |
| Purchase Price | $50,000.00 |

4.  The Parties agree to co-operate in the filing of elections under the *Internal Revenue Code* and under any other applicable taxation legislation, in order to give the required or desired effect to the allocation of the Purchase Price.

**Closing**

5.  The Closing of the purchase and sale of the Assets will take place on April 29th, 2016 (the "Closing Date") at the offices of the Seller or at such other time and place as the Parties mutually agree.

6.  At Closing and upon the Purchaser resolving the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser. The Seller will deliver to the Purchaser possession of the Assets, free and clear of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.

7.  At Closing and upon the Purchaser resolving the Purchase Price in full to the Seller, the Seller will provide the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, assignments, assurances, and consents. The Seller will also co-operate with the Purchaser as needed in order to effect the required registration, recording, and filing with public authorities of the transfer of ownership of the Assets to the Purchaser.

**Payment**

8.  The Purchase Price for the Assets will be paid by the Purchaser with a promissory note (the "Promissory Note") in the form attached, in the amount of the Purchase Price, made out to the Seller.

9. The Purchaser is responsible for paying all applicable taxes, including federal sales tax, state sales tax, duties, and any other taxes or charges payable that are necessary to give effect to the transfer of the Assets from the Seller to the Purchaser.

**Seller's Representations and Warranties**

10. The Seller represents and warrants to the Purchaser that:

   a. The Seller has full legal authority to enter into and exercise its obligations under this Agreement.

   b. The Seller is the absolute beneficial owner of the Assets, with good and marketable title, free and clear of any liens, charges, encumbrances or rights of others. The Seller is exclusively entitled to possess and dispose of the Assets.

   c. To the best knowledge of the Seller there is no pending or anticipated claim against the Assets or against the Seller's ownership or title in the Assets or against the Seller's right to dispose of the Assets.

   d. No third party contract is outstanding that could result in a claim against or affecting the Assets in whole or in part either now or in the future.

   e. The Business does not have any outstanding contracts, agreements, or commitments of any kind, written or oral, with any third party regarding the Assets, except for the material contracts described in, and attached to this Agreement. The seller represents and warrants that no default or breach exists with regard to any presently outstanding material contract.

   f. Execution of this Agreement will not hinder or unfairly disadvantage any pre-existing creditor.

   g. There has been no act or omission by the Seller that would give rise to any valid claim relating to a brokerage commission, finder's fee, or other similar payment.

   h. The Seller is a resident of the United States for the purposes of the *Internal Revenue Code*.

   i. The Business has withheld all amounts required to be withheld under income tax legislation and has paid all amounts owing to the proper authorities.

WC001761

j.      The Business is not bound by any written or oral pension plan or collective bargaining agreement or obligated to make any contributions under any retirement income plan, deferred profit sharing plan or similar plan.

k.      The Business will not hire any new employees, or substantially change the role or title of any existing employees, provide unscheduled or irregular increases in salary or benefits to employees, or institute any significant changes to the terms of any employees' employment, after signing this Agreement, unless the Purchaser provides written consent.

l.      There are no claims threatened or pending against the Business by any current or past employee relating to any matter arising from or relating to the employment of the employee.

m.      The Assets, while owned by the Seller, have been maintained at all times in accordance with standard industry practice. The Seller further warrants that all tangible assets are in good working order.

n.      The Business is operating in accordance with all applicable laws, rules, and regulations of the jurisdictions in which it is carried on. In compliance with such laws, the Seller has duly licensed, registered, or qualified the Business with the appropriate public authorities.

o.      The Business maintains insurance policies on the Assets, of full force and effect, and of adequate value as would be reasonable in its industry. The Business has neither defaulted under these insurance policies, as a result of failure to pay premiums or due to any other cause, nor has the Business failed to give notice or make a claim under these insurance policies in a timely manner.

p.      The Business owns or is licensed to use all necessary software and it can continue to use any and all computerized records, files and programs into the foreseeable future in the same manner as before the Closing Date.

q.      The Business has filed all tax reports and returns required in the operation of the Business and has paid all taxes owed to all taxing authorities, including foreign taxing authorities, except amounts that are being properly contested by the Seller, the details of this contest having been provided to the Purchaser.

WC001762

r.     This Agreement has been duly executed and delivered by the Seller and constitutes a legal and binding obligation of the Seller, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

11.   The representations and warranties given in this Agreement are the only representations and warranties. No other representation or warranty, either expressed or implied, has been given by the Seller to the Purchaser, including, without limitation, any representations or warranties regarding the merchantability of the Assets or their fitness for a particular purpose.

12.   The Seller warrants to the Purchaser that each of the representations and warranties made by it is accurate and not misleading at the Closing Date. The Seller acknowledges that the Purchaser is entering into this Agreement in reliance on each warranty and representation.

13.   The Seller's representations and warranties will survive the Closing Date of this Agreement for a period of five years, after which time, if no claim has been made by the Purchaser against the Seller regarding the breach or inaccuracy of a representation or warranty, the Seller will have no further liability with regard to any of the representations or warranties given in this Agreement.

14.   Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, the Seller will have no liability to the Purchaser unless the Purchaser provides notice in writing to the Seller containing full details of the claim on or before the third anniversary of the Closing Date.

15.   Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, and the Purchaser is entitled to recover damages from a third party then the amount of the claim against the Seller will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Purchaser in recovering the amount from the third party.

### Purchaser's Representations and Warranties

16.   The Purchaser represents and warrants to the Seller the following:

a.     The Purchaser has full legal authority to enter into and exercise its obligations under this Agreement.

b.    The Purchaser has funds available to pay the full Purchase Price and any expenses accumulated by the Purchaser in connection with this Agreement and the Purchaser has not incurred any obligation, commitment, restriction, or liability of any kind, absolute or contingent, present or future, which would adversely affect its ability to perform its obligations under this Agreement.

c.    The Purchaser has not committed any act or omission that would give rise to any valid claim relating to a brokerage commission, finder's fee, or other similar payment.

d.    The Purchaser is a resident of the United States for the purposes of the *Internal Revenue Code*.

e.    This Agreement has been duly executed by the Purchaser and constitutes a legal and binding obligation of the Purchaser, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

f.    The Purchaser has no knowledge that any representation or warranty given by the Seller in this Agreement is inaccurate or false.

17.    The representations and warranties given in this Agreement are the only representations and warranties. The Purchaser has given no other representation or warranty, either expressed or implied, to the Seller.

18.    The Purchaser warrants to the Seller that each of the representations and warranties made by it is accurate and not misleading at the date of Closing. The Purchaser acknowledges that the Seller is entering into this Agreement in reliance on each warranty and representation.

19.    The Purchaser's representations and warranties will survive Closing for a period of five years, after which time, if no claim has been made by the Seller against the Purchaser regarding the breach or inaccuracy of a representation or warranty, the Purchaser will have no further liability with regard to any of the representations or warranties given in this Agreement.

20.    Where the Seller has a claim against the Purchaser relating to one or more representations or warranties made by the Purchaser, the Purchaser will have no liability to the Seller unless the

Seller provides notice in writing to the Purchaser containing full details of the claim on or before the third anniversary of the Closing Date.

21. Where the Seller has a claim against the Purchaser relating to one or more representations or warranties made by the Purchaser, and the Seller is entitled to recover damages from a third party then the amount of the claim against the Purchaser will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Seller in recovering the amount from the third party.

**Conditions Precedent to be Performed by the Purchaser**

22. The obligation of the Seller to complete the sale of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Purchaser, on or before the Closing Date, each of which is acknowledged to be for the exclusive benefit of the Seller and may be waived by the Seller entirely or in part:

  a. All of the representations and warranties made by the Purchaser in this Agreement will be true and accurate in all material respects on the Closing Date.

  b. The Purchaser will obtain or complete all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or any governmental or public body, required of the Purchaser in connection with the execution of this Agreement.

  c. The Purchaser will execute and deliver the Promissory Note to the Seller.

**Conditions Precedent to be Performed by the Seller**

23. The obligation of the Purchaser to complete the purchase of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Seller, on or before the Closing Date, each of which is acknowledged to be for the exclusive benefit of the Purchaser and may be waived by the Purchaser entirely or in part:

  a. All of the representations and warranties made by the Seller in this Agreement will be true and accurate in all material respects on the Closing Date.

  b. The Seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or governmental or

public body that are required of the Seller for the proper execution of this Agreement and transfer of the Assets to the Purchaser.

c.    No substantial damage to or alteration of the Assets that would adversely affect their value will occur between the date this Agreement is signed and the Closing Date.

d.    The Seller will have obtained any necessary consents for assigning any leases to the Purchaser as well as providing estoppel certificates from such owners or landlords that there are no arrears of rent, no breaches under such leases and the amount of the security deposits held by such third parties.

e.    The Seller will execute and deliver bills of sale for the Assets in favor of the Purchaser.

f.    The Seller will provide the Purchaser with complete information concerning the operation of the Business, in order to put the Purchaser in a position to carry on in the place of the Seller.

### Disclosure

24.    Upon the reasonable request of the Purchaser, the Seller will, from time to time, allow the Purchaser and its agents, counsel, accountant, employees, or other representatives to have unrestricted access to the premises of the Business and to all of the books, records, documents, and accounts of the Business, during normal business hours, between the date of this Agreement and the Closing Date, in order for the Purchaser to confirm the representations and warranties given by the Seller in this Agreement.

### Conditions Precedent Not Satisfied

25.    If either Party fails to satisfy any condition precedent as set out in this Agreement on or before the Closing Date and the opposite Party does not waive that condition precedent, then this Agreement will be null and void and there will be no further liability as between the Parties.

### Employees

26.    At least 30 days prior to the Closing Date, the Purchaser will provide written offers of employment to every employee of the Business (the "Transferred Employees"). The offers of employment will be subject to execution of this Agreement and successful closing of this transaction. Prior to the Closing Date, the Purchaser will make itself available to discuss with each Transferred Employee the terms of the individual employment offers.

27.    The Purchaser will not offer employment to any employee of the Business who is receiving disability benefits under a disability plan of the Seller as of the Closing Date. Those employees receiving disability benefits will not be considered a Transferred Employee and will remain the full responsibility of the Seller.

28.    The Seller will pay all employee compensation incurred by it up to and including the Closing Date and including all salaries, benefits, bonuses and any other compensation of any kind owing to all employees up to and including the Closing Date. The Seller will be responsible for all severance benefits, vacation days, sick days, personal days and other compensated time off accrued by all employees up to and including the Closing Date.

29.    The Seller is in compliance with all applicable foreign and domestic statutory rules and regulations respecting employment and employment practices and has withheld and reported all amounts required by law with respect to wages and salaries and the Seller is not liable for any accrued taxes or penalties and is not liable or in arrears to any government or private pension, social security or unemployment insurance authority. The Seller indemnifies the Purchaser for any future liabilities relating to employment and employment practices where the subject of the liability occurred up to and including the Closing Date.

30.    To the best knowledge of the Seller, no labor dispute is currently in progress, pending or threatened involving the Transferred Employees of the Business that would interfere with the normal productivity or production schedules of the Business.

31.    After the Closing Date, the Purchaser will adopt, assume, and become solely responsible for all Transferred Employee benefit plans including, but not limited to, all health and disability plans and pension plans currently administered by the Seller. The Purchaser will collect and pay over to the Seller any contributions of the Seller's employees that relate to periods prior to and including the Closing Date. The Purchaser agrees to waive all waiting or qualification periods and pre-existing conditions and limitations of such plans for the Transferred Employees.

<u>Non-Assumption of Liabilities</u>

32.    It is understood and agreed between the Parties that the Purchaser is not assuming and will not be liable for any of the liabilities, debts or obligations of the Seller arising out of the ownership or operation of the Business prior to and including the Closing Date.

WC001767

33.   The Seller will indemnify and save harmless the Purchaser, its officers, directors, employees, and agents from and against all costs, expenses, losses, claims, and liabilities, including reasonable legal fees and disbursements, or demands for income, sales, excise or other taxes, suffered or incurred by the Purchaser or any of the above mentioned persons arising out of the ownership or operation of the Business prior to and including the Closing Date.

### Transfer of Third Party Contracts

34.   This Agreement should not be construed as an assignment of any third party contract from the Seller to the Purchaser if the assignment would be a breach of the third party contract.

35.   The Purchaser will be solely responsible for acquiring new contracts with third parties where the existing contracts are not legally assignable from the Seller to the Purchaser.

36.   Notwithstanding any other provision in this Agreement to the contrary, the Seller will not be liable for any losses, costs or damages of any kind including loss of revenue or decrease in value of the Business resulting from the failure of the Purchaser to acquire any third party contracts.

### Notices

37.   Any notices or deliveries required in the performance of this Agreement will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Parties at the addresses contained in this Agreement or as the Parties may later designate in writing.

### Expenses/Costs

38.   The Parties agree to pay all their own costs and expenses in connection with this Agreement.

### Confidentiality

39.   The Seller and the Purchaser will hold confidential all information (the "Confidential Information") pertaining to this Agreement including, but not limited to, the terms of this Agreement, the Purchase Price, the Parties to this Agreement, and the subject matter of this Agreement as well as any written or oral information obtained about the respective Parties that is not currently in the public domain. Confidential Information will not include the following:

a.      Information generally known in the respective industries of the Purchaser and the Seller.

WC001768

b.   Information that enters the public domain through no fault of the Purchaser or the Seller.

c.   Information that is independently created by the Purchaser or the Seller respectively without direct or indirect use of information obtained during the course of negotiations for this Agreement.

d.   Information that is rightfully obtained by the Purchaser or the Seller from a third party who has the right to transfer or disclose the information.

40.   The Seller and the Purchaser may disclose any Confidential Information relating to this Agreement to any of its employees, agents and advisors where there is a need to know in relation to this Agreement and where the personnel agree to be legally bound by the same burdens of confidentiality.

41.   The Seller agrees to indemnify the Purchaser against any and all harm suffered by the Purchaser for any breach of confidentiality by the personnel of the Seller.

42.   The Purchaser agrees to indemnify the Seller against any and all harm suffered by the Seller for any breach of confidentiality by the personnel of the Purchaser.

43.   The confidentiality restrictions in this Agreement will continue to apply after the Closing Date of this Agreement without any limit in time.

### Severability

44.   The Parties acknowledge that this Agreement is reasonable, valid, and enforceable; however, if any part of this Agreement is held by a court of competent jurisdiction to be invalid, it is the intent of the Parties that such provision be reduced in scope only to the extent deemed necessary to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected or invalidated as a result.

45.   Where any provision in this Agreement is found to be unenforceable, the Purchaser and the Seller will then make reasonable efforts to replace the invalid or unenforceable provision with a valid and enforceable substitute provision, the effect of which is as close as possible to the intended effect of the original invalid or unenforceable provision.

### Governing Law

46.   This Agreement will be governed by and construed in accordance with the laws of the State of Nevada.

### Jurisdiction

47.   The courts of the State of Nevada are to have jurisdiction to settle any dispute arising out of or in connection with this Agreement.

### General Provisions

48.   This Agreement contains all terms and conditions agreed to by the Parties. Statements or representations which may have been made by any Party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value to either Party. Only the written terms of this Agreement will bind the Parties.

49.   This Agreement may only be amended or modified by a written instrument executed by all of the Parties.

50.   A waiver by one Party of any right or benefit provided in this Agreement does not infer or permit a further waiver of that right or benefit, nor does it infer or permit a waiver of any other right or benefit provided in this Agreement.

51.   This Agreement will not be assigned either in whole or in part by any Party without the written consent of the other Party.

52.   This Agreement will pass to the benefit of and be binding upon the Parties' respective heirs, executors, administrators, successors, and permitted assigns.

53.   The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

54.   All of the rights, remedies and benefits provided in this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law or equity.

55.   Time is of the essence in this Agreement.

56.   This Agreement may be executed in counterparts.

57.   Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in the neuter gender include the masculine gender and the feminine gender and vice versa.

IN WITNESS WHEREOF the Parties have duly affixed their signatures under hand and seal on this ____29th____ day of April, 2016.

SIGNED, SEALED, AND DELIVERED
in the presence of:

X  Witness: _____ (Sign)
X  Witness Name: _____

_Allen Roach_
_____ (Seller)  4/29/16

SIGNED, SEALED, AND DELIVERED
in the presence of:

X  Witness: _____ (Sign)
X  Witness Name: _____

X  _Ryan Roach_
X  _____ (Purchaser)  4-29-16

Paid in full as
of Feb 24th of
2017

Allen Roach

©2002-2016 LawDepot.com™

# EXHIBIT C

## (Fair Labor Standards Act Narrative Report)

# EXHIBIT C

**Wellfleet Communications LLC**
**dba Wellfleet Communications**
3100 Sahara Ave
Suite 209
Las Vegas, NV 89102
TEL. (702) 777-5555

Case ID:1765378
EIN: 27-1938987

## POINTS OF CONTACT

Allen Roach
Owner
3100 Sahara Ave
Suite 209
Las Vegas, NV 89102
702-777-5555 x602

Malani L Kotchka
Attorney
520 South Fourth Street
Suite 320
Las Vegas, NV 89101
702-834-8777

### FAIR LABOR STANDARDS ACT NARRATIVE REPORT

### COVERAGE:

The subject firm is a telemarketing company that sells long distance phone service for AT&T, Birch Communications, Verizon and other companies and is owned and operated by Allen Roach.

Mr. Allen Roach, 100% owner states the managers oversee the telemarketers and report to him and that he is responsible for the day to day business operations. Mr. Roach is responsible to obtaining contracts, sets the rates of pay, commission rates and hours for the firm.

Wellfleet Communications sells phone service in the state of Nevada to people residing on other states like New Mexico, Virginia and New York; therefore, all calls made from the subject firm are interstate calls. (See Exb B-7)

The subject firm's ADV for the past three years, provided at the initial conference exceeds the $500,000 threshold for the investigative period of 10/15/2012-10/16/2015.

2012 ADV $3,812,053
2013 ADV $3,829,707
2014 ADV $2,479,190
(See exhibit C-3-3b)

The subject firm handles goods that have been moved in commerce including office supplies from Office Max which include paper clips made in Florida, paper made in South Carolina and

DOL036127

pens made in Japan. This information was provided by the employer during the initial conference (See Exb. C-1)
**Period for this investigation** is 10/15/2012-10/16/2015

## EXEMPTIONS:

The employer classified the following managers as salary exempt: Mij Courtney Manager of Birch Business 2, Sara Robinson Manager of the Long Distance Programs, Stephanie Sulusi Manager of Birch Business, and Dawn Piazza Office Manager. Their duties include interviewing, hiring and supervising employees.
This information was gathered from interview statements due to the salary employees not providing statements. (See employee statements B-2, B-3, B-5, B-16, B-19, B-21)

## STATUS OF COMPLIANCE:

**History:** Prior history in WHISARD:  None

**Reason for Investigation:**

The investigation was initiated by a complaint filed by

The complainant alleged he was misclassified as an independent contractor being paid commission only on sales made for long distance phone service and not being paid at least minimum wage for all hours worked.

At the time of the initial conference, the owner stated he had a staff of eighteen (18) employees, to include himself.  Mr. Roach stated all of the telemarketers were independent contractors, therefore, he did not feel the need to keep accurate time records for them.  Mr. Roach states the independent contractors are paid commission only on a sliding scale.  Mr. Roach states he does not keep time or pay records for the independent contractors claiming their ability to come and go as they please qualifies them as independent contractors. Mr. Roach states the hours of operation are from 7:00am and closes at 7:00pm Monday through Friday and 9 am to 2pm Saturday.  Saturday is not a regularly scheduled work day and considered optional to the telemarketers.  Through employee interviews, WHI Ann determined there are multiple shifts available to the telemarketers. The first shift is from 7am to 2pm and the second shift is from 9am to 4pm and the third shift is from 2pm to 7pm.  All of the telemarketers are required to take a 30 minute lunch at the same time.  A floor manager will dismiss the representatives for their lunch and breaks at the same time.  Interview statements confirm this

DOL036128

information. (B1-B24) In addition, the interview statements affirm many will stay after their shift and work the optional Saturday to achieve a sales quota.

The firm advertises in local papers and online for sales representatives/telemarketers. They also have a sign at the front desk that reads, "Now Hiring." Interview statements confirm they complete an application and are interviewed prior to being hired. Employees fill out an application, take a test, are interviewed and provided on the job training. (See Exb. B-12) At the time of hire, they are asked to complete a contract in which they are signing they are an independent contractor and would be paid as such. (See exhibit D-3-3d) The subject firm sets the rate of pay in the form of a commission scale. The employees are provided with the commission pay scale, which is determined by the subject firm. The employee is not able to negotiate the rate of pay. (See Exb. D-7) In addition to the pay scale, they are provided with the rules and guidelines for attendance and their work schedule. They are granted an attendance bonus on all calls if they are punctual throughout the work week. (See exhibit B-1) Should they be tardy or truant during the work week they lose the attendance bonus for the entire work week; for example, if their commission is $20 per line and they are on time all five days of the week they would receive $25 per line instead of the $20. If they are tardy or truant throughout the week, they lose the $5 bonus. The floor manager tracks all of the sales representative's time on calls, their arrival and departure time in addition to their breaks. All sales representatives are dismissed for their two ten minute breaks and thirty minute lunch at the same time by the manager. The subject firm sells phone and utility lines to residential and business customers in other states. All sales are done over the telephone using an auto-dialer and computer. As soon as one call ends, the computer system automatically dials the next telephone number for the sales representative. The sales representatives use a script provided by the subject firm to complete the sale. All sales are conducted from the subject firm's establishment. Sales representatives do not provide their own leads, equipment nor set their own schedules. The headset used to conduct the call, the computer, the leads, the telephone service and script are all provided by the subject firm. The employee does not provide any of the necessary materials to perform their job. The services provided by the sales representatives are an integral part of the subject firms business. The nature of business for the subject firm is sales via the telephone. Employee interview statements confirmed employees do not advertise their telemarketing skills and services as telemarketers elsewhere, nor do they work at another telemarketing company at the same time they worked for the subject firm. In addition to using a script to complete a sale, the sales representatives have a manager that will assist them in closing a deal or working with a customer. (See exhibit B1-B24)

Method of computation to determine hours worked:

Due to the employer failing to keep accurate record of hours worl d, the calculation of weekly hours worked was determined by interview statements. Based on the interview statements the workers claimed they would start working at the start time of their shift with no pre shift work and stopped working at the end of their scheduled shift with no post shift work would take a mandatory 30 minute lunch break. Although Mr. Roach claims they would be able to come and go as they please and rarely work a full shift. Telemarketers would typically work a 7 hour shift excluding the 30 minute lunch and work a 5

day work week. Although most telemarketers work the morning shift some do work the afternoon shift from 2pm to 7pm. Taking the afternoon shift into consideration and employees not working a full 5 day work week, the average hours worked weekly was reduced average from 35 to 25.5. (See Exb. E-1-1b)

Ex –                                 would work Monday through Friday 7am to 2:30 with a 30 minute lunch.
7 hours a day multiplied by 5 days a week = 35 hours worked a week, reduced to an average 25.5 hour work week
25.5 * 7.25 minimum wage = $184.88 due to employee

<u>Method of Computation to determine amount paid to employees:</u>

Employees are paid weekly commissions along with monthly spiffs. The monthly spiff was divided by .2308 to determine a weekly payment. The weekly commission and weekly spiff are combined to determine if the employee was paid at least $7.25 for 25.5 hours worked.

Ex –                             received weekly commission checks and a        monthly Spiff for the month of

| Date | Commission Paid | Monthly Spiff | Weekly Spiff | Total Paid | Hourly Rate | Amount Due |
|------|-----------------|---------------|--------------|------------|-------------|------------|
|      |                 |               |              |            |             |            |
|      |                 |               |              |            |             |            |
|      |                 |               |              |            |             |            |

The employee earned $       hourly for 25.5 hours worked.
The difference of 7.25 and       is
      * 25.5 =
The employee did not earn at least minimum wage in                     resulting in a total due for

        The employer failed to keep a record of payment for hours worked. The employer states the workers were independent contractors and that he did not need to keep the required records. The employer has a time keeping system in place for all hourly and salary workers and                      The employer agreed to have all workers utilize the time clock for keeping track of time. (See Exb. D-4)

DOL036130

## DISPOSITION:

A final conference was held at the Las Vegas District Office with Mr. Allen Roach, Assistant District Director Gene Ramos and WHI Alisa Ann on April 6 2016.

WHI Ann informed Mr. Roach he violated the record keeping requirement by not tracking hours worked and monies paid for hours worked for misclassified independent contractors. Mr. Roach stated when he inherited the business from his brother he took over the business and had an audit performed by a Certified Public Accountant and the Nevada State Department of Taxation. Mr. Roach stated that the result of the investigation was that the workers are being classified correctly. Mr. Roach was not able to provide a copy of the determination. Mr. Roach claimed the prior investigation is his Good Faith Defense. WHI Ann informed Mr. Roach it is his responsibility to provide any proof of his Good Faith Defense and it would be considered when assessing Liquidated Damages. WHI Ann informed Mr. Roach due to his inability to provide any documentation full Liquidated Damages will be assessed for back wages due.

WHI Ann informed Mr. Roach he violated Sec. 6 of the Fair Labor Standards Act by not paying employees at least minimum wage for all hours worked. WHI Ann informed Mr. Roach the total back wages found to 1444 employees is $803,387.24. Mr. Roach stated he was unable to pay that amount and that he should be fined a small amount since he is in compliance. WHI Ann replied stating the Wage Hour Division does not assess fines but seeks back wages to be paid to the affected employees. WHI Ann informed Mr. Roach the Nevada State Labor Commission has several investigations on hold until the case is concluded with Wage and Hour and that if there is no agreement to pay, all workers can individually make claims against him for more than the 3 year period of investigation. Mr. Roach stated he was not able to pay the full amount but might be able to pay a portion of the amount. WHI Ann provided financial disclosure documents for Mr. Roach to complete for evaluation to determine his ability to pay.

### Addendum to Disposition:

On April 26 2016 Mr. Ramos received an email from Attorney Malani Kotchka stating she has been retained by Wellfleet to represent them in the investigation asking time to review the documentation and schedule a meeting. (See Exb. D-12)

On June 8, 2016 Attorney Malani Kotchka met with WHI Ann and ADD Ramos to discuss the back wages found. WHI Ann and ADD Ramos briefed Attorney Kotchka on the determination of misclassified independent contractors and that it has been verified Mr. Roach has come into compliance effective 02/01/2016 by tracking all hours worked and paying at least minimum wage for all hours worked to all employees.

WHI Ann informed Ms. Kotchka of the total amount in back wages owed; explaining the original amount found due was reduced due to conversations with Mr. Roach to decrease the average weekly hours worked from 35 to 25.5. WHI Ann informed Ms. Kotchka the Labor

Commission of Nevada has several complaints on hold waiting for the outcome of this investigation. Mr. Ramos informed Ms. Kotchka that if Mr. Roach is willing to pay but not able to pay the full amount determined he would need to complete the financial disclosure statements which would be reviewed by the forensic accountant to determine the amount the employer would be able to pay. Mr. Ramos also instructed Ms. Kotchka that if Mr. Roach is not able to pay any back wages the employees would be notified of their rights for private action.

WHI Ann provided Ms. Kotchka the individual transcriptions for all employees found due along with the financial disclosure documents to be completed by Mr. Roach. Ms. Kotchka stated she will review the information with her client and provide a response by June 30, 2016.

**Complainant Notification:**

On 06/24/16 WHI Ann attempted to contact the complainant with the phone number provided during intake.

**Publications:** Provided the Handy Reference Guide, Fair Labor Standards Act, Overtime Publicaiton #1325, CFR Reg 516, 578, 779, 785 and Fact Sheets 21, 22, 23, 44, 64 & 77A at the initial conference.

**Recommendation:**

**Alisa Ann**
**Wage & Hour Investigator**
**Tuesday, June 28, 2016**